O

NO JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| YDM MANAGEMENT CO., INC., | ) | Case No. CV 15-00897 DDP (Ex) |
| Plaintiff, | ) ) | **ORDER GRANTING DEFENDANT'S MOTION TO DISMISS** |
| v. | ) ) | [Dkt. No. 22] |
| AETNA LIFE INSURANCE COMPANY, a Connecticut corporation, | ) ) ) ) | |
| Defendants. | ) ) | |

Presently before the Court is Defendant Aetna Life Insurance Company's ("Aetna") Motion to Dismiss Plaintiff's First Amended Complaint Pursuant to Rule 12(b)(6). (Dkt. No. 22.) After considering the parties' submissions, the Court adopts the following Order.

**I.  BACKGROUND**

This breach of contract case arises out of Plaintiff's allegation that Defendant has failed to fully pay for health care services provided to Defendant's insureds by Plaintiff's assignors who are "medical groups, physicians, and health care providers." (See generally First Am. Compl. ("FAC"), dkt. no. 18.) Plaintiff's assignors were out-of-network health care providers for Defendant

Aetna insureds, but they provided care to the insureds with the understanding that Aetna would pay for the services. (Id. ¶¶ 9-11.)

Before providing any treatment, the assignors contacted Aetna about each patient with an Aetna insurance card, calling the number provided on the card. (Id. ¶ 13.) During the phone conversations, the assignors would inform Aetna of the type of treatment that would be provided and verified that the patient was covered for the treatment. (Id.) The assignors sought Aetna's authorization and consent before providing the services, informing Aetna that the services would be provided in exchange for payment. (Id.) The FAC alleges that Aetna "accepted that offer and agreed to pay the Physicians [assignors] for the specified services, treatments and supplies to be provided and rendered to each of the Patients." (Id.) The assignors then provided the treatments "fully expecting that they would be paid for the usual, customary and reasonable value of their services." (Id.) Plaintiff alleges that the assignors were never informed of any coverage or policy limits. (Id. ¶ 15.)

Further, the assignors "were led to believe that they would be paid a portion or percentage of their total billed charges, equivalent to the usual customary and reasonable amount charged by similarly situated other physicians in the same geographical area, less any deductibles, co-insurance amounts and other offsets identified to the Physicians [assignors] during their phone conversations with Aetna." (Id. ¶ 16.) Plaintiff alleges that during the phone conversations, the deductibles and other amounts were identified to the assignors and the assignors were told "to

2

submit their claims to Aetna and [were] promised that Aetna would adjust, adjudicate, examine and pay each of those claims at usual, customary and reasonable rates," subject to the deductibles and other identified amounts. (Id. ¶ 17; see also id. ¶ 19.) The assignors would submit claims to Aetna, not the patients, and Aetna would pay the assignors directly. (Id. ¶¶ 18, 19.)

The FAC claims that Aetna never informed the assignors of the actual amount Aetna would pay for the services to be provided to its insureds other than the offset amounts. (Id. ¶ 20.) When certain assignor providers asked how much Aetna would pay for the service, Aetna representatives "could not identify or quantify an amount that it would pay or allow for the specific services, nor could it identify or quantify a methodology, metric, rubric, standard, formula or other quantification method that Aetna would use when adjusting and paying the claims." (Id. ¶¶ 20-21.) Due to Aetna's failure to provide guidelines for its payment, the assignors "believed that they would be paid by Aetna in an amount which was commensurate with the usual, customary and reasonable value (or the *quantum meruit*) of the services and treatments to be rendered." (Id. ¶ 23.)

Plaintiff claims that because the assignor health care providers were out-of-network providers, they did not receive any benefits from Aetna, such as increased business and patients from the plan. (Id. ¶ 25.) The assignors do not provide a discount on the billed services because they do not receive a commensurate benefit as do in-network providers. (Id.) Therefore, according to Plaintiff, the charges for an out-of-network provider are usually higher than those for an in-network provider, although

3

still a customary and reasonable amount. (Id.) This means that if Aetna pays out-of-network providers less or equal to in-network providers, then Aetna is "benefitted twice":

> First, it is benefitted when its members choose to obtain their medical services, treatments, and health care from out-of-network providers, because Aetna allows an amount for non-participating providers which is less than the amount it allows to participating providers, and thereby pays less for a non-participating provider's claim than an in-network provider's claim for the same services. Secondly, because a Patient's co-insurance amounts and/or deductibles are also higher when an out-of-network provider is utilized, Aetna pays a substantially discounted amount of that reduced, allowed amount as well.

(Id. ¶ 26.)

The FAC alleges that Aetna's failure to provide rates to health care providers and insureds before the out-of-network services are provided "makes it impossible for the Patients/insureds and the Physicians to know how much the Physicians will be paid and how much the Patients' out of pocket payments will be, until after the claim has been processed, adjusted and paid." (Id. ¶ 27.) By that time, Plaintiff claims, the service will have already been provided and thus the patient and health care provider will be unable to decide if the price Aetna will pay is acceptable to them. (Id.)

The FAC claims that Aetna has underpaid for the out-of-network services provided to its insureds, and Aetna has never explained how it calculated its rates to the providers. (Id. ¶¶ 29-31.) The treatments were medically necessary and appropriate, but Aetna paid the health care providers "at rates far below the reasonable value for those treatments, services and/or supplies, even though there was no written contractual relationship or preferred provider relationship between the Physicians and Aetna." (Id. ¶ 33.) When

4

Aetna provided the payment, it also included an "Explanation of Benefits Statement," but this statement did not explain how the amount Aetna paid was determined or give any accounting. (Id. ¶¶ 40-41.) Plaintiff claims the amounts paid were "substantially less than the submitted charges or billed amounts . . . and [were] typically more than 50% less than the amount billed." (Id. ¶ 41.) According to Plaintiff's quotation of the Benefits Statement, it indicated that Aetna pays "for covered expenses at the prevailing charge level made for the service in the geographical area where it is provided." (Id. ¶ 42 (no citation provided).)

The FAC claims that by approving the provision of services to its insureds, Aetna entered into a oral or implied contract to pay the service providers for the treatments at a rate similar to the customary and reasonable value of the services. (Id. ¶ 46.) The FAC identifies many specific problems it alleges with how Aetna calculates its rates and sets up its payment databases. (Id. ¶ 50.) The health care service providers have assigned their claims to Plaintiff to collect the amounts owing to them. (Id. ¶¶ 4-5.)

The FAC alleges seven causes of action: (1) recovery of payment for services rendered; (2) recovery of payment on open book account and/or accounted stated; (3) *quantum meruit*; (4) breach of implied-in-fact and/or implied-in-law contract; (5) declaratory relief; (6) breach of oral contract; and (7) promissory estoppel.

**II. LEGAL STANDARD**

A 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted requires a court to determine the sufficiency of the plaintiff's complaint and whether it contains a "short and plain statement of the claim showing that the pleader is

5

entitled to relief." See Fed. R. Civ. P. 8(a)(2).  Under Rule 12(b)(6), a court must (1) construe the complaint in the light most favorable to the plaintiff, and (2) accept all well-pleaded factual allegations as true, as well as all reasonable inferences to be drawn from them.  See Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001), amended on denial of reh'g, 275 F.3d 1187 (9th Cir. 2001).

In order to survive a 12(b)(6) motion to dismiss, the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678.  Dismissal is proper if the complaint "lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1104 (9th Cir. 2008).

A complaint does not suffice "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 556).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.  The court need not accept as true "legal conclusions merely because they are cast in the form of factual allegations." Warren v. Fox Family Worldwide, Inc., 328 F.3d 1136, 1139 (9th Cir. 2003).

///

## III. DISCUSSION

Defendant has brought this Motion to Dismiss against each of Plaintiff's causes of action. Generally, Defendant claims that the FAC is "vague," an "attempt to plead around California law," and does not put Defendant on notice of the terms of all the alleged obligations or how the obligations were created. (Mot. Dismiss at 1.) Because this is a diversity case, Defendant contends that California law applies and that California law states that out-of-network providers that are not providing emergency services only receive payment pursuant to the terms of the individual health care plan. (Id. (citing Orthopedic Specialists of S. Cal. v. Cal. Pub. Emps.' Ret. Sys., 228 Cal. App. 4th 644 (2014) (hereinafter "CalPERS"); Cal. Code Regs., tit. 28, § 1300.71(a)(3)(c)).)

Plaintiff responds that the FAC is clear in its theory of the case: "YDM's assignor was underpaid by Aetna and that Defendant Aetna had an obligation to pay usual, customary, and reasonable rates to YDM's assignor." (Opp'n at 3.) These claims are "based upon oral representations and promises made by Aetna's representatives to YDM's assignor." (Id.) According to Plaintiff, the FAC provides a full account of the facts underlying Plaintiff's claims. (Id. at 7.)

Plaintiff also argues that the CalPERS case cited by Defendant is distinguishable because Defendant here is an insurance company, not a government entity. (Id. at 8-10.) Thus, certain contract claims that were not available to the plaintiff in that case are available to Plaintiff here, such as implied contract, recovery of payment for services rendered, and quantum meruit. (Id.) According to Plaintiff, CalPERS was "a governmental entity that

7

directly provided health coverage to its employees and their dependents through a self-funded program, which was neither an insurance program nor an HMO or PPO program," although it was administered by Anthem Blue Cross. (<u>Id.</u> at 8.) By contrast here, Plaintiff argues, Aetna is "an actual insurance company and is therefore subject to California law (California Insurance Codes and/or California Health & Safety Codes)." (<u>Id.</u>)

*First*, the Court notes a fatal overarching problem to the FAC: it fails to state what insurance claims and contracts are at issue. That is, the FAC provides no notice of or factual basis for Defendant to determine which contracts or claims it allegedly owes payment. Even if there are only implied-in-fact contracts or oral promises or other kinds of quasi-contract theories, Aetna would need some indication of which claims are allegedly not fully paid, as well as what amounts were paid and are allegedly still owing — something like claim numbers or an indicia of what patients or treatments are at issue. Additionally, the FAC does not indicate how much damages Plaintiff is seeking so as to establish the jurisdictional amount, much less indicate to Defendant how much the case is worth. (<u>See</u> FAC at 36-37.)[1]

Further, the only assignment provided in the FAC is between Morris B. Silver, M.D., a medical corporation; Morris B. Silver, M.D.; and YDM, the plaintiff here. (<u>Id.</u> Ex. A.) This single assignment of one physician is confusing because the FAC references YDM as an assignee "of certain medical groups, physicians, and

---

[1] The FAC alleges only that "more than $75,000, exclusive of interests and costs, is at stake in this suit" in stating the basis for diversity jurisdiction. (FAC ¶ 1.)

8

health care providers," stating that those assignors' assignment of interest are attached to the FAC as Exhibit A. This statement reads like there are more assignors than one physician and his medical corporation, but that is the only assignment provided. Thus, it appears that the FAC may be just the claims of one physician for an unspecified number of patients for unspecified treatments and claims with an unspecified amount owing. That is insufficient under even the Federal Rules of Civil Procedure's liberal pleading standard. See Fed. R. Civ. Pro. 8. Therefore, Defendant's Motion to Dismiss is granted as to all causes of action, but Plaintiff has fourteen days leave to amend to correct this deficiency.

*Second*, the Court also notes that CalPERS and California regulations bar some of Plaintiff's theories and causes of action as a matter of law. The case in CalPERS involved a health care provider plaintiff suing CalPERS for the remainder of an amount allegedly owing for the plaintiff's provision of treatment to a patient who was a member of "the PERS Choice health plan," which the court explained as a "health insurance plan[]" operated by CalPERS. 228 Cal. App. 4th at 645-46. CalPERS is a government agency that provides health insurance plans to state employees through contracts with third party administrators such as Anthem Blue Cross, as well as administers the retirement system for state and public employees. Id. at 646.

The plan at issue in the case (the PERS Choice health plan) was a preferred provider organization ("PPO") and the plaintiff was an out-of-network provider. Id. at 646, 649. The court found that the amount CalPERS owed to an out-of-network provider for

9

nonemergency services given to a PPO insured is governed by the insured's Evidence of Coverage ("EOC") under California law. Id. at 648 (citing Cal. Code Regs., tit. 28, § 1300.71(a)(3)(C)). The EOC in that case stated that CalPERS would pay for 60% of an "Allowable Amount," with the remaining 40% owed by the patient. Id. at 647. The "Allowable Amount" was the lesser of three definitions, including an agreed-upon amount or an amount determined based on certain factors, but all of which were ultimately up to the insurance company. Id.

In that case, Anthem could be contacted prior to the provision of services so that the out-of-network provider and patient could determine "the exact amount that will be paid for the services" and if it "makes economic sense for the patient to find an in-network or preferred provider, whose charges are paid at a higher contracted rate and for which the patient is not responsible." Id. The EOC provided that Anthem would determine what it would pay an out-of-network provider, which may not be the customary and reasonable rate. Id.

The plaintiff in CalPERS relied on cases that the court found were not applicable because the cases involved out-of-network emergency services or a Medi-Cal health maintenance organization. Id. at 648-49 (citing Children's Hosp. Cent. Cal. v. Blue Cross of Cal., 226 Cal. App. 4th 1260 (2014); Prospect Med. Grp., Inc. v. Northridge Emergency Med., 45 Cal. 4th 497 (2009); Bell v. Blue Cross of Cal., 131 Cal. App. 4th 211 (2005)). The payment owed in those cases was governed by a different subsection of the California regulations. Id. (citing Cal. Code Regs., tit. 28, § 1300.71(a)(3)(B)).

The court further explained that because CalPERS was a government entity, California law prevented a private party from suing on an implied oral promise to pay, or other contract theories such as implied-in-law, quasi-contract, quantum meruit, or restitution theories. Id. at 649-50 (citing Cal. Gov't Code § 815(a); Janis v. Cal. State Lottery Comm'n, 68 Cal. App. 4th 824, 830 (1998)).

The California regulations define "reimbursement of a claim" as:

> (A) For contracted providers with a written contract, including in-network point of service (POS) and preferred provider organizations (PPO): the agreed upon contract rate;
>
> (B) For contracted providers without a written contract and non-contracted providers, except those providing services described in paragraph (C) below: the payment of the reasonable and customary value for the health care services rendered based upon statistically credible information that is updated at least annually and takes into consideration: (I) the provider's training, qualifications, and length of time in practice; (ii) the nature of the services provided; (iii) the fees usually charged by the provider; (iv) prevailing provider rates charged in the general geographic area in which the services were rendered; (v) other aspects of the economics of the medical provider's practice that are relevant; and (vi) any unusual circumstances in the case; and
>
> (C) For non-emergency services provided by non-contracted providers to PPO and POS enrollees: the amount set forth in the enrollee's Evidence of Coverage.

Cal. Code Regs., tit. 28, § 1300.71(a)(3)(A)-(C).

It appears that the court's decision in CalPERS and the regulations provided above dictate that Plaintiff's assignor health care providers were entitled to the amount provided for in Aetna's Evidence of Coverage, not a reasonable and customary value of the services. The facts in this case are similar in important ways to

11

the case in CalPERS such that the rule provided there applies here as well.  That is, an out-of-network provider is entitled to payment for services given to PPO patients, but such payment is limited to the amount in the patients' plans for nonemergency services.  That rule is not limited to government entities or some other subset of health plans.  It is taken from the California regulations for health care service plans such as PPOs, which can be run by insurance companies or other entities.

Thus, to the extent that any of Plaintiff's causes of action rely on § 1300.71(a)(3)(B) for the legal basis of Plaintiff's demand for reasonable and customary value of the services provided to Aetna patients, such a cause of action is dismissed with prejudice for failure to state a claim upon which relief can be granted because amendment would be futile.

*Third*, Plaintiff has causes of action that may not be precluded by CalPERS or the California regulations, such as those that are based on a promise, oral contract, or implied contract by Aetna to pay something other than what is required under law. Those causes of action were barred in CalPERS because the defendant there was a government entity, but here, Aetna is not.  Thus, to the extent that Plaintiff can allege sufficient factual bases for these causes of action and the theory that Aetna promised to pay more than it was legally required to under the California regulation (i.e., pay the reasonable and customary price rather than the price in its Evidence of Coverage), then those causes of action and theory of the case are not barred by law.

Further, certain differences between the facts alleged here and those in CalPERS could change the results and equities involved

12

in the two cases.  For example, the out-of-network provider in CalPERS was able to learn the exact price Anthem was willing to pay for the services before the services were provided.  CalPERS, 228 Cal. App. 4th at 648.  By contrast, Plaintiff alleges here that despite calling Aetna before providing any services, Aetna did not inform the assignor providers the exact price Aetna would pay, but that Aetna did say that it would pay claims for the services provided "at usual, customary and reasonable rates, subject only to the outstanding deductibles, co-payment amounts, co-insurance amounts, lifetime limitations and other specific offsets" that were identified by the Aetna representatives.  (FAC ¶¶ 17, 20.)  According to Plaintiff, "when, on occasion, the Physicians asked how much they would be paid for the services to be rendered to the Patients, they were told that Aetna could not identify or quantify an amount that it would pay or allow for the specific services."  (Id. ¶ 20.)  Thus, it again appears that Plaintiff could state a claim upon which relief can be granted such that amendment of the FAC is not futile.

    Therefore, the motion to dismiss is granted with leave to amend the nonbarred causes of action.  Plaintiff must clearly specify what claims and amounts are at issue in this case, the number of claims, patients, and physicians, the bases for the causes of action, and other specific factual grounds that show the elements of the causes of actions are present.  Conclusory allegations that something happened or was said that fulfills the elements of a cause of action but that lacks any level of detail — such as what is alleged in the current FAC — are insufficient.

///

**IV. CONCLUSION**

For all the above reasons, the Court GRANTS Defendant's Motion to Dismiss.  Plaintiff has fourteen days from the date of this Order to file a Second Amended Complaint addressing the issues discussed above otherwise the case will be dismissed with prejudice.

IT IS SO ORDERED.

Dated: March 28, 2016

                                        DEAN D. PREGERSON
                                      United States District Judge